AMBER HARLAN,             )
                               )
      Plaintiff,          )
                               )
      vs.               )         Case No. 2:11CV 89 AGF(LMB)
                               )
MICHAEL J. ASTRUE,     )
Commissioner of Social Security,  )
                               )
      Defendant.     )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Amber Harlan for Disability Insurance Benefits under Title II of the Social Security Act, and Supplemental Security Income under Title XVI of the Act. The cause was referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a Brief in Support of Plaintiff's Complaint. (Document Number 12). Defendant has filed a Brief in Support of the Answer. (Doc. No. 17).

## Procedural History

On January 27, 2010, plaintiff filed her application for benefits, claiming that she became unable to work due to her disabling condition on September 1, 2004. (Tr. 117-30). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated January 27, 2011. (Tr. 61-66, 12-

24).  Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the

Social Security Administration (SSA), which was denied on September 22, 2011.  (Tr. 6, 1-5).

Thus, the decision of the ALJ stands as the final decision of the Commissioner.  <u>See</u> 20 C.F.R. §§

404.981, 416.1481.

<b><u>Evidence Before the ALJ</u></b>

**A.     <u>ALJ Hearing</u>**

Plaintiff's administrative hearing was held on January 14, 2011.  (Tr. 31).  Plaintiff was

present and was represented by counsel.  (<u>Id.</u>).  Also present was Tom King, vocational expert.

(<u>Id.</u>).

Plaintiff's attorney indicated that he was waiting on records from St. John's Mercy and

Dr. Jeffrey Cramp.  (<u>Id.</u>).  The ALJ stated that he would leave the record open for fourteen days.

(<u>Id.</u>).

The ALJ noted that the file indicated plaintiff had earned $13,808.00 in 2008.  (Tr. 33).

Plaintiff testified that she did not work full-time in 2008, and that she did not recall whether she

worked at all in 2008.  (<u>Id.</u>).  The ALJ indicated that he would investigate this issue after the

hearing.  (<u>Id.</u>).

The ALJ examined plaintiff, who testified that she was thirty years of age and was

separated from her husband.  (Tr. 34).  Plaintiff stated that she had two children, aged twelve and

nine, who lived with her.  (Tr. 35).

Plaintiff testified that she graduated from high school and attended cosmetology school,

but did not complete the program.  (<u>Id.</u>).

Plaintiff stated that she last worked in 2005 or 2006 as a cashier at Dollar General.  (<u>Id.</u>).

Plaintiff testified that she had been receiving $200.00 a month in child support since she and her husband separated in 2004. (Id.). Plaintiff stated that she had been receiving Social Security disability benefits for her son for about three years. (Tr. 36). Plaintiff testified that her son has bipolar disorder.[1] (Id.).

Plaintiff stated that she has musculoskeletal problems, including degenerative disc disease,[2] osteoarthritis,[3] and a bulging disc. (Id.). Plaintiff testified that these impairments started to become a problem in 2007. (Id.). Plaintiff stated that she was not involved in an accident at this time. (Id.). Plaintiff testified that she attended physical therapy for a short time in 2007, but otherwise she just "lived with it." (Id.).

Plaintiff stated that she took Tramadol[4] in 2007, and she was taking Percocet[5] and Tramadol at the time of the hearing. (Tr. 37). Plaintiff testified that she receives about fifty percent relief from her medications. (Id.). Plaintiff stated that she has also undergone injections

---

[1]An affective disorder characterized by the occurrence of alternating manic, hypomanic, or mixed episodes and with major depressive episodes. Stedman's Medical Dictionary, 568 (28th Ed. 2006).

[2]A general term for both acute and chronic processes destroying the normal structure and function of the intervertebral discs. See J. Stanley McQuade, Medical Information Systems for Lawyers, § 6:201 (1993).

[3]Arthritis characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed, and thinned with eburnation of subchondral bone and outgrowths of marginal osteophytes; pain and loss of function result. Stedman's at 1388.

[4]Tramadol is indicated for the management of moderate to moderately severe chronic pain in adults who require around-the-clock treatment of their pain for an extended period of time. See Physician's Desk Reference ("PDR"), 2429 (63rd Ed. 2009).

[5]Percocet is indicated for the relief of moderate to moderately severe pain. See PDR at 1127

for pain relief.  (Id.).  Plaintiff testified that she had been receiving injections approximately once a

year since 2007.  (Id.).  Plaintiff stated that she was scheduled to undergo a series of injections

later in the year.  (Id.).

Plaintiff testified that her doctor told her that she needs surgery, but that she should wait

as long as possible before undergoing surgery because she was young.  (Id.).

Plaintiff stated that she was five-feet, two inches tall, and weighed 250 pounds.  (Tr. 38).

Plaintiff testified that she had been diagnosed with bipolar disorder and generalized anxiety

disorder.[6]  (Id.).  Plaintiff testified that she was diagnosed with bipolar disorder when she was

fourteen years of age, and she was diagnosed with generalized anxiety disorder in 2010.  (Id.).

Plaintiff stated that she took medication sporadically when she was younger, but she had been

consistently taking medication for her mental impairments since May of 2010.  (Id.).

Plaintiff testified that she only takes her anxiety medication as needed.  (Tr. 39).  Plaintiff stated

that, when she experiences anxiety, she becomes hot, nervous, and dizzy.  (Id.).  Plaintiff testified

that these episodes are triggered by grocery shopping, being in crowds, and driving in traffic.

(Id.).

Plaintiff stated that she takes medication for migraine headaches and hypothyroidism.[7]

(Tr. 40).  Plaintiff testified that she had been experiencing migraines since she was seven years

old.  (Id.).  Plaintiff stated that she was diagnosed with hypothyroidism in 2010.  (Id.).  Plaintiff

---

[6]A psychological disorder in which anxiety or morbid fear and dread accompanied by
autonomic changes are prominent features.  Stedman's at 569.

[7]Diminished production of thyroid hormone, leading to clinical manifestations of thyroid
insufficiency, including low metabolic rate, tendency to gain weight, somnolence, and sometimes
edema.  Stedman's at 939.

testified that the medication controls these conditions.  (Id.).

Plaintiff stated that she experiences a migraine at least once a week.  (Id.).  Plaintiff testified that she takes Relpax[8] or Fioricet[9] for migraines.  (Id.).

Plaintiff stated that she was raising her two children on her own.  (Id.).  Plaintiff testified that her husband comes over to visit with the children in the afternoon a few times a week.  (Tr. 41).  Plaintiff stated that her children take the bus to school.  (Id.).  Plaintiff testified that she gets her children ready in the morning, and that they leave the house at 7:30 a.m.  (Id.).  Plaintiff stated that the children return home at 4:00 p.m.  (Id.).

Plaintiff testified that, when her children are at school, she reads and tries to get up to do laundry.  (Id.).  Plaintiff stated that she relies on her children and her family to do most things.  (Id.).  Plaintiff testified that her mother and her twin sister both live within one block away from her.  (Tr. 42).  Plaintiff stated that her mother and her sister come over to visit with her a few times a week, and help her if she asks for help.  (Id.).  Plaintiff testified that she cooks.  (Id.).  Plaintiff stated that she is able to perform some household chores, and her children and her mother perform the remainder of the chores.  (Id.).  Plaintiff testified that she shops for groceries, does the laundry, and picks up around the house.  (Id.).

Plaintiff stated that she reads romance novels or other fiction.  (Id.).  Plaintiff testified that she has a computer, and that she visits sites like Facebook and Yahoo mail.  (Tr. 43).  Plaintiff stated that she enjoys reading, fishing, watching movies, and doing puzzles.  (Id.).  Plaintiff

---

[8]Relpax is indicated for the treatment of migraines.  See WebMD, http://www.webmd.com/drugs (last visited November 2, 2012).

[9]Fioricet is indicated for the treatment of tension headaches.  See WebMD, http://www.webmd.com/drugs (last visited November 2, 2012).

testified that she fishes at a lake in her town with her sister.  (Id.).  Plaintiff stated that she last

fished with her sister in September or October of 2010.  (Id.).

Plaintiff testified that she went on a five-day cruise to Mexico with her children and her

mother in the summer of 2010.  (Tr. 44).  Plaintiff stated that the cruise ship left from Mobile,

Alabama, and that her mother drove the family to Mobile.  (Id.).  Plaintiff testified that she paid

for the cruise with her tax return, which was approximately $5000.00.  (Tr. 45).

Plaintiff stated that she was able to sit for fifteen to twenty minutes.  (Id.).  Plaintiff

testified that she was able to lift five to ten pounds.  (Id.).  Plaintiff stated that she was able to

walk about one hour, and stand about forty-five minutes.  (Id.).

When asked for the "biggest reason" why she was unable to return to work, plaintiff

testified that she was unable to concentrate due to her bipolar disorder.  (Tr. 46).

Plaintiff's attorney then examined plaintiff, who testified that she experienced both manic

and depressive days related to her bipolar disorder.  (Id.).  Plaintiff stated that she experienced

about fourteen manic days a month, seven depressive days a month, and the remainder of the

month she feels normal.  (Id.).

Plaintiff testified that, on a manic day, she becomes agitated easily and experiences panic

attacks.  (Id.).  Plaintiff stated that she also does "stupid things," such as spending money she

does not have, engaging in sexual activity with the wrong men, and going out "partying."  (Tr.

47).  Plaintiff testified that she has not gone out partying for a few years.  (Id.).  Plaintiff stated

that she has difficulty complying with her medication on manic days.  (Tr. 48).  Plaintiff testified

that she has become violent with her husband and her children when she was irritable, although

she has never hit them.  (Id.).  Plaintiff stated that she has never had any confrontations with co-

workers or supervisors. (Id.).

Plaintiff testified that, on depressive days, she contemplates suicide, does not want to get out of bed, does not answer phone calls from her family, and does not want to be around people. (Id.). Plaintiff stated that she attempted suicide when she was eight years old, and again when she was fourteen. (Id.). Plaintiff testified that she also cut herself when she was fourteen. (Id.). Plaintiff stated that she frequently cries when she is depressed. (Id.). Plaintiff testified that her family comes over to check on her when she is depressed. (Id.).

Plaintiff stated that she has difficulty completing tasks. (Tr. 49). Plaintiff testified that she had not finished a book in two years. (Id.). Plaintiff stated that she is unable to focus long enough to finish a book. (Id.).

Plaintiff testified that she takes anxiety medications for panic attacks, and that she experiences panic attacks about twice a month. (Id.). Plaintiff stated that her anxiety attacks last about one hour, and that she takes the medication when she feels them coming on. (Tr. 50). Plaintiff testified that she feels an overwhelming sense of dread during a panic attack. (Id.). Plaintiff stated that she also feels faint, and must sit down. (Id.). Plaintiff testified that she had experienced a panic attack while working, and that she sat in her boss's office for about thirty minutes. (Id.).

Plaintiff stated that her hypothyroidism affects her when she does not take her medication. (Tr. 51). Plaintiff testified that she feels really sluggish and has difficulty walking when she does not take her medication. (Id.). Plaintiff stated that she was gaining about seven pounds a month before she started taking medication for hypothyroidism. (Id.). Plaintiff testified that she has no effects from the hypothyroidism when she takes her medication. (Id.).      Plaintiff stated that

she was unable to sit for long periods and changes positions frequently. (Tr. 52). Plaintiff testified that she frequently lies down throughout the day. (Id.). Plaintiff stated that she lies down five to six times for periods of one to two hours each throughout the day. (Id.).

Plaintiff testified that she experiences dizziness and a feeling of euphoria from her pain medication. (Id.). Plaintiff stated that she occasionally experiences nausea from her medication. (Id.).

The ALJ examined vocational expert Tom King, who testified that plaintiff's work as a retail cashier was classified as light and semiskilled, although plaintiff performed the work at a medium level. (Tr. 53). Plaintiff stated that plaintiff also worked as a nursing home housekeeper, which was medium and unskilled. (Id.).

The ALJ asked Mr. King to assume a hypothetical claimant with plaintiff's background and the following limitations: able to occasionally lift twenty pounds and frequently lift ten pounds, with a sit/stand option at will; can only occasionally push with the lower extremities; occasionally climb stairs, and cannot climb ladders, ropes, scaffold or running; can occasionally bend, stoop, crouch, crawl, balance, twist and squat; limited exposure to heights, dangerous machinery, uneven surfaces, and vibration; and able to get along with others, understand simple instructions, concentrate for simple tasks, and respond and adapt to work place changes and supervision, but in a limited public employee contact setting. (Id.). Mr. King testified that the individual would be unable to perform any of plaintiff's past work. (Id.). Mr. King stated that the individual could perform other light, unskilled jobs, such as office helper (1,000 jobs in Missouri, 195,000 nationally); sorter (900 jobs in Missouri, 185,000 nationally); and shipping weigher (750 jobs in Missouri, 160,000 nationally). (Tr. 54).

Plaintiff's attorney next examined Mr. King, who testified that an individual who had to lie down five to six times a day for fifteen minutes at a time would be unable to perform any jobs in the national economy. (Id.).

Mr. King stated that an individual who would miss an average of three days of work a month due to symptoms of depression would be unable to perform any jobs in the national economy. (Tr. 55).

Mr. King testified that an individual would be unable to maintain the jobs he mentioned if she could not stay on task at least eighty-five percent to ninety percent of the workday. (Id.).

Plaintiff's attorney stated that there was not much medical evidence regarding plaintiff's mental ability to perform in the work place, and requested a consultative examination. (Id.). The ALJ stated that the additional medical records plaintiff was submitting would address plaintiff's mental condition. (Tr. 56). The ALJ indicated that he would not order a consultative examination. (Id.). The ALJ noted that plaintiff recently went on a cruise, which spoke to her functional ability. (Id.).

**B.** **Relevant Medical Records**

The record reveals that plaintiff saw Dr. Jeffrey Cramp for various complaints from 2004 through 2006. (Tr. 379-89). On May 2, 2006, plaintiff complained of migraine headaches for the prior three days, along with low back pain shooting down her left leg. (Tr. 384). Dr. Cramp prescribed medication and gave plaintiff a note excusing her from work or school until May 8, 2006. (Tr. 385). On June 22, 2006, plaintiff presented to Dr. Cramp with complaints of depression beginning three weeks prior. (Tr. 383). It was noted that plaintiff did not take any medications daily. (Id.). Dr. Cramp diagnosed plaintiff with depression and prescribed

Cymbalta.[10] (Id.).  Dr. Cramp saw plaintiff on three more occasions between June 2006 and

November 2006 for complaints of sore throat and right eye swelling, and for an annual pelvic

examination.  (Tr. 379-82).

Plaintiff presented to Michael Rothermich, M.D. on June 19, 2007, with complaints of

right ear pain.  (Tr. 257).  Plaintiff saw Dr. Rothermich for various complaints from February

2008 through November 2010, including depression, headaches, back pain, ear pain, foot pain,

and anxiety.  (Tr. 234-55).  On February 20, 2008, plaintiff complained of depression.  (Tr. 255).

Dr. Rothermich diagnosed plaintiff with suspected bipolar disorder/mood disorder and prescribed

Symbyax.[11] (Id.).  On March 21, 2008, Dr. Rothermich diagnosed plaintiff with mood disorder,

greatly improved with medication.  (Tr. 253).  On March 3, 3009, Dr. Rothermich found that

plaintiff's mood disorder was doing well on Symbyax, but plaintiff reported anxiety/panic attacks.

(Tr. 252).  Dr. Rothermich recommended relaxation techniques.  (Id.).  On April 28, 2009,

plaintiff complained of headaches occurring for the past three days.  (Tr. 251).  Dr. Rothermich

diagnosed plaintiff with migraine headache and prescribed Verapamil[12] and Relpax.  (Id.).  In

April and August of 2009, plaintiff complained of lower back pain.  (Tr. 250, 245).

Plaintiff underwent an MRI of the lumbar spine[13] on May 29, 2009, which revealed mild

---

[10]Cymbalta is indicated for the treatment of major depressive disorder and generalized
anxiety disorder.  See PDR at 1801.

[11]Symbyax is indicated for the treatment of depressive episodes associated with bipolar
disorder.  See PDR at 1873.

[12]Verapamil is indicated for the treatment of hypertension.  See PDR at 512.

[13]The back is comprised of the cervical, thoracic and lumbar regions.  In common terms,
the cervical region of the spinal column is the neck; the thoracic region is the main part of the
back; and the lumbar region is the lower back.  There are seven cervical vertebrae, twelve thoracic

change of degenerative disc disease at the L5-S1 level. (Tr. 279).

Plaintiff underwent a physical therapy evaluation on June 2, 2009, upon the referral of Dr. Rothermich. (Tr. 221). It was recommended that plaintiff attend physical therapy two to three times a week for three to four weeks. (Id.). On June 12, 2009, plaintiff was discharged from physical therapy, after not showing up for her last appointment or returning phone calls. (Tr. 222). Plaintiff had attended only one visit. (Id.).

Dr. Rothermich diagnosed plaintiff with chronic lower back pain in August 2009, and noted that pain medication helped. (Tr. 245). On August 25, 2009, plaintiff reported that she had gone to the emergency room for a migraine. (Tr. 244). Plaintiff saw Dr. Rothermich for medication refills in August and September of 2009. (Tr. 242-43).

Plaintiff saw neurologist James Alonso, M.D., for evaluation of back pain and numbness in her right leg on September 24, 2009. (Tr. 224). Plaintiff reported experiencing migraines since she was a child, but indicated that they had decreased since she stopped smoking. (Id.). Upon physical examination, plaintiff had normal bulk and tone, slightly reduced strength on the left side of her body, intact sensory exam, and a steady gait, with difficulty noted on heel, toe, and tandem walking. (Tr. 225). Dr. Alonso's impression was back pain, paresthesias,[14] and migraines. (Id.). He recommended further imaging and physical therapy, and started plaintiff on Neurontin.[15] (Id.).

vertebrae, and five lumbar vertebrae. The sacrum lies directly below the fifth lumbar vertebra. The coccyx, or tail bone, lies below the sacrum. See Medical Information Systems for Lawyers, § 6:27.

[14]A spontaneous abnormal usually nonpainful sensation (e.g., burning, pricking); may be due to lesions of both the central and peripheral nervous systems. Stedman's at 1425.

[15]Neurontin is indicated for the treatment of nerve pain. See WebMD, http://www.webmd.com/drugs (last visited November 2, 2012).

Plaintiff underwent MRIs of the cervical, thoracic, and lumbar spine on September 29, 2009. (Tr. 226-28). The cervical and thoracic spine MRIs were normal. (Tr. 227-28). The MRI of the lumbar spine revealed degenerative changes at the L5-S1 disc level associated with a moderate midline disc protrusion. (Tr. 226).

In October of 2009, plaintiff saw Dr. Rothermich for complaints of earache, diarrhea, and left foot pain. (Tr. 239-41). Plaintiff complained of a serious, six-day left frontal headache on December 7, 2009. (Tr. 237). Dr. Rothermich diagnosed plaintiff with acute left frontal sinusitis.[16] (Id.). On December 23, 2009, plaintiff complained of stress and anxiety. (Tr. 236). Dr. Rothermich prescribed Zyprexa[17] and Lexapro.[18] (Id.). On January 12, 2010, Dr. Rothermich found that plaintiff's bipolar disorder was much better. (Tr. 235). On January 15, 2010, plaintiff requested disability license plate tags due to her back pain. (Tr. 234). Dr. Rothermich noted that plaintiff's bipolar disorder was stable on medication. (Id.).

Plaintiff presented to Christopher R. Hemmer, NP, on January 21, 2010, with complaints of severe low back pain. (Tr. 306). Plaintiff reported a three-to-four-year history of back pain, with a marked exacerbation of her pain the last month. (Id.). Upon examination, plaintiff ambulated slowly without any assistive devices with an antalgic[19] gait. (Id.). Mr. Hemmer

---

[16]Inflammation of the mucous membrane of any sinus. Stedman's at 1777.

[17]Zyprexa is a psychotropic drug indicated for the treatment of schizophrenia and bipolar disorder, and agitation associated with schizophrenia and bipolar I mania. See PDR at 1884-85.

[18]Lexapro is indicated for the treatment of major depressive disorder and generalized anxiety disorder. See PDR at 1174-75.

[19]A limp adopted so as to avoid pain on weight-bearing structures. Stedman's at 99.

diagnosed plaintiff with degenerative disc disease isolated to the L5-S1 level, and recommended an epidural steroid injection.  (Id.).

Plaintiff presented to Kevin Coleman, M.D. at Millennium Pain Management on January 29, 2010, upon the referral of Dr. Rothermich.  (Tr. 373).  Upon examination, plaintiff had tenderness in the bilateral lumbar paraspinous muscles.  (Tr. 374).  Plaintiff did not exhibit any signs of depression, anxiety, or agitation.  (Id.).  Dr. Coleman diagnosed plaintiff with lumbar degenerative disc disease, and administered an epidural steroid injection at L5-S1.  (Tr. 375).

Plaintiff saw Dr. Coleman on February 16, 2010, at which time she complained of lower back and right leg pain.  (Tr. 368).  It was noted that plaintiff was taking Percocet.  (Id.).  Plaintiff reported experiencing partial relief from the epidural steroid injection.  (Id.).  Dr. Coleman diagnosed plaintiff with lumbar radicular pain, and administered an epidural steroid injection.  (Tr. 369).

On February 23, 2010, plaintiff presented to Dr. Rothermich with complaints of headaches, and indicated that the Reflex had worked last time.  (Tr. 328).

Dr. Coleman administered an epidural steroid injection on March 2, 2010.  (Tr. 364).

On March 3, 2010, plaintiff presented to Dr. Rothermich with complaints of shortness of breath and back pain.  (Tr. 327).

On March 23, 2010, plaintiff reported to Dr. Coleman that she received good pain relief from her mediation and injections.  (Tr. 361).  Plaintiff's medications were listed as Neurontin, Percocet, and Zyprexa.  (Id.).  Plaintiff declined an epidural steroid injection at that time.  (Tr. 362).

Plaintiff saw Steven Granberg, M.D. at Millennium Pain Management on April 15, 2010,

- 13 -

at which time plaintiff reported that she received sixty-five to seventy percent relief from her medication. (Tr. 358). Dr. Granberg diagnosed plaintiff with lumbar radicular pain and continued her on Percocet. (Tr. 359). (Id.). Plaintiff's mood was described as upbeat. (Tr. 356). Plaintiff's medications were continued. (Id.).

On May 10, 2010, plaintiff reported no change in her symptoms to Dr. Coleman and indicated that she was looking forward to vacation on May 13th. (Tr. 355). Plaintiff reported that she was going on a cruise with her family. (Id.).

Plaintiff saw Dr. Granberg on June 10, 2010, at which time she reported no change in her symptoms. (Tr. 352). Plaintiff reported experiencing seventy percent relief with her medications. (Id.). Plaintiff's medications were continued. (Tr. 353).

On June 24, 2010, plaintiff reported experiencing panic attacks for a couple years, with the last one occurring two days prior when she was in the middle of traffic. (Tr. 326). Dr. Rothermich diagnosed plaintiff with panic disorder with depression, lately more due to uncontrolled hypothyroidism. (Id.). Dr. Rothermich prescribed Xanax.[20] (Id.).

Plaintiff saw Dr. Coleman on July 8, 2010, at which time plaintiff reported no change in her symptoms. (Tr. 350). Plaintiff's mood was described as upbeat. (Id.).

On July 20, 2010, plaintiff reported that her panic attacks and anxiety were not helped with Xanax. (Tr. 325). Dr. Rothermich diagnosed plaintiff with panic disorder, which was likely at least partially from hypothyroidism; hypothyroidism; and severe headaches controlled with medication. (Id.). On July 26, 2010, plaintiff reported worsening panic attacks, with increased

---

[20]Xanax is indicated for the treatment of anxiety and panic disorders. See WebMD, http://www.webmd.com/drugs (last visited November 2, 2012).

anxiety, racing thoughts, and inability to sleep. (Tr. 324). Dr. Rothermich diagnosed plaintiff with bipolar disorder exacerbation and insomnia, and prescribed Zyprexa. (Id.).

Plaintiff saw Dr. Coleman on August 6, 2010, at which time she reported near complete relief from her medications. (Tr. 347). Plaintiff indicated that her leg pain had improved considerably with the adjustment of her medication. (Id.). Plaintiff's mood was described as upbeat. (Tr. 348). Plaintiff's medications were continued. (Id.).

Plaintiff saw Dr. Granberg on September 2, 2010, at which time she reported that her medications "made things a little better." (Tr. 344). Plaintiff continued to experience pain in her right leg. (Id.). On September 16, 2010, plaintiff reported no change in her symptoms and indicated that she continued to have adequate pain relief with her medication dosage. (Tr. 341). Dr. Granberg's assessment was lumbalgia.[21] (Tr. 342). Plaintiff's medications were continued. (Id.).

In September through November of 2010, plaintiff presented to Dr. Rothermich with complaints of stomach burn, ingrown toenail, and a viral upper respiratory infection. (Tr. 321-23).

Plaintiff saw Dr. Granberg on December 9, 2010, at which time Dr. Granberg indicated that plaintiff continued to have adequate pain relief of her low back pain. (Tr. 338). It was noted that plaintiff would restart injections in the spring. (Id.). Dr. Granberg diagnosed plaintiff with lumbalgia, and continued her medications. (Tr. 339). Plaintiff was scheduled to return to the clinic in three months for follow-up of medication and for a steroid injection. (Id.).

### The ALJ's Determination

---

[21]Pain in the lower back. Stedman's at 1121.

The ALJ made the following findings:

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2009.

2.     The claimant engaged in substantial gainful activity during the following periods: 4th quarter in 2008 (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3.     However, there has been a continuous 12-month period during which the claimant did not engage in substantial gainful activity. The remaining findings address the period(s) the claimant did not engage in substantial gainful activity.

4.     The claimant has the following severe impairments: osteoarthrosis; obesity; bipolar-anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

5.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

6.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work, occasionally lifting/carrying 20 pounds and frequently lifting/carrying 10 pounds, as defined in 20 CFR 404.1567(b) and 416.967(b), except that she requires a sit/stand option at will, and has the ability to walk 4 out of 8 hours for a full 8-hour workday. The claimant has unlimited ability to perform gross and fine movements and to push/pull within the weight limitations, except for occasional pushing with the lower extremities. She can occasionally climb stairs but no ladders, ropes, or scaffolds. She cannot run. She can occasionally bend, stoop, crouch, crawl, balance, twist, and squat. The claimant should have limited exposure to heights, dangerous machinery, uneven surfaces, and vibration. The claimant gets along with others, understands simple instructions, concentrates and performs simple tasks and responds and adapts to workplace changes and supervision but in a limited public/employee contact setting.

7.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965)

8.     The claimant was born on September 7, 1980, and was 24 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

9.     The claimant has at least a high school education and is able to communicate in

English (20 CFR 404.1564 and 416.964).

10.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), and 416.969(a)).

12.     The claimant has not been under a disability, as defined in the Social Security Act, from September 1, 2005, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 14-24).

The ALJ's final decision reads as follows:

Based on the application for a Period of Disability and Disability Insurance Benefits filed on January 22, 2010, the claimant is not disabled under sections 216(I) and 223(d) of the Social Security Act.

Based on the application for Supplemental Security Income filed on January 27, 2010, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 24).


## Discussion

### A.     Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v.

Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

**B.    The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the

claimant suffers from a medically severe impairment or combination of impairments.
See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience.  See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform

other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments.  See 20 C.F.R. §§ 404.1520a (a), 416.920a (a).  A special procedure must be followed at each level of administrative review.  See id.  Previously, a standard report entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required.  See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758 (2000).  Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council.  See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.  See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace.  See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).  Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.  See id.  Next, the Commissioner must determine the severity of the impairment

based on those ratings.  See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).  If the impairment is

severe, the Commissioner must determine if it meets or equals a listed mental disorder.  See

20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of

medical findings and the rating of functional loss against the paragraph A and B criteria of the

Listing of the appropriate mental disorders.  See id.  If there is a severe impairment but the

impairment does not meet or equal the listings, then the Commissioner must prepare a residual

functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3); Pratt, 956

F.2d at 834-35; Jones v. Callahan, 122 F.3d 1148, 1153 n.5 (8th Cir. 1997).

**C.      Plaintiff's Claims**

Plaintiff first argues that the ALJ erred in determining plaintiff's RFC.  Plaintiff next

contends that the ALJ's credibility analysis was improper.  Plaintiff finally argues that the ALJ

erred in finding that plaintiff's migraines were not severe.  The undersigned will discuss plaintiff's

claims in turn, beginning with the severity of plaintiff's migraines.

**1.      Severity of Migraines**

Plaintiff argues that the ALJ erred in failing to include plaintiff's migraine headaches in his

listing of plaintiff's severe impairments.

"An impairment is not severe if it amounts only to a slight abnormality that would not

significantly limit the claimant's physical or mental ability to do basic work activities."  Kirby v.

Astrue, 500 F.3d 705, 707 (8th Cir. 2007).  It is the claimant's burden to establish that an

impairment is severe.  Id.  "Severity is not an onerous requirement for the claimant to meet, but it

is also not a toothless standard . . . ."  Id. at 708.

The ALJ acknowledged that plaintiff occasionally complained of migraines to medical

providers. (Tr. 15). The ALJ noted that plaintiff's migraines were present prior to her alleged onset date as plaintiff testified that she had experienced migraines since the age of seven. (Tr. 22). The ALJ stated that the fact that this condition did not prevent plaintiff from working at that time strongly suggests that it would not currently prevent work. (Id.).

The ALJ did not err in failing to include migraines in his listing of plaintiff's severe impairments. Plaintiff complained of a migraine headache lasting three days on May 2, 2006. (Tr. 384). Dr. Cramp diagnosed plaintiff with migraine headache. (Id.). Plaintiff complained of headaches occurring for three days on April 28, 2009. (Tr. 251). Dr. Rothermich diagnosed plaintiff with migraine headache and prescribed Relpax. (Id.). On August 25, 2009, plaintiff reported to Dr. Rothermich that she had gone to the emergency room due to a migraine. (Tr. 244). Plaintiff reported to Dr. Alonso in September 2009 that she had been experiencing migraines since she was a child, although they had decreased since she stopped smoking. (Tr. 224). In February 2010, plaintiff complained of headaches to Dr. Rothermich and indicated that the Relpax had worked the last time. (Tr. 328). On July 20, 2010, Dr. Rothermich diagnosed plaintiff with severe headaches controlled with medication. (Tr. 325). Plaintiff testified at the administrative hearing that she had been having migraines since she was seven years old, and that her migraines were controlled with medication. (Tr. 40). Plaintiff stated that she experienced a migraine headache approximately once a week. (Id.). Plaintiff did not allege the presence of any other symptoms accompanying the migraines, such as nausea or sensitivity to light.

The record reveals that plaintiff complained of migraines on approximately four occasions in a period of four years, and that her migraines were treated effectively with medication. Plaintiff has not demonstrated that her migraines significantly limited her ability to do basic work activities.

Thus, plaintiff failed to meet her burden to establish this impairment was severe.

Accordingly, the undersigned recommends that the decision of the Commissioner be affirmed as to this point.

## 2.    Credibility Analysis

Plaintiff argues that the ALJ's credibility determination was improper.  Defendant contends that the ALJ properly assessed plaintiff's credibility.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced."  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors."  Kelley, 133 F.3d at 588.  Polaski requires the consideration of:  (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) aggravating and precipitating factors; (4) dosage, effectiveness and side effects of the medication; and (5) functional restrictions.  Polaski, 739 F.2d at 1322.

"'If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [the Court] will normally defer to the ALJ's credibility determination.'"  Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2008)); accord Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011).  Additionally, although "ALJs "must acknowledge and consider [the] . . . Polaski factors before discounting a claimant's subjective complaints, . . . ALJs 'need not explicitly discuss each Polaski factor.'"  Wildman v. Astrue, 596 F.3d 959, 968 (8th Cir. 2010) (quoting Goff v.

Barnhart, 421 F.3d 785, 791 (8th Cir. 2005)); accord Buckner, 646 F.3d at 559 (holding that an ALJ's credibility findings are not negated by a failure to cite Polaski when the relevant factors are considered); Lowe v. Apfel, 226 F.3d 969, 971-72 (8th Cir. 2000) (holding that although ALJ was required to make express credibility determinations, he "was not required to discuss methodically each Polaski consideration, so long as he acknowledged and examined those considerations before discounting [the claimant's] subjective complaints").

The undersigned finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence in the record as a whole.  "[T]he question is not whether [plaintiff] suffers any pain; it is whether [plaintiff] is fully credible when she claims that [the pain] hurts so much that it prevents her from engaging in her prior work."  Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987).  Thus, the relevant inquiry is whether or not plaintiff's complaints of pain to a degree of severity to prevent her from working are credible.

The ALJ first discussed plaintiff's daily activities.  (Tr. 20).  The ALJ noted that the function report completed by plaintiff indicates a greater level of activity than did plaintiff's testimony.  (Id.).  The ALJ pointed out that plaintiff indicated in her function report that she gets her children ready for school, reads romance novels or fiction, cleans the house, cooks, showers, does the laundry and dishes, drives, uses public transportation, goes out three times a week, goes shopping in stores, operates a computer, does puzzles, and watches television.  (Tr. 20, 185-92).  The ALJ noted that plaintiff testified at the hearing that she uses Facebook and emails relatives, and goes fishing at a local lake with her sister.  (Tr. 20, 43).  Significant daily activities may be inconsistent with claims of disabling pain.  See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir.

2001). The ALJ properly found that plaintiff's activities of daily living were not consistent with the alleged severity of her pain and symptoms. (Tr. 20).

The ALJ next stated that, despite plaintiff's allegations of symptoms and limitations preventing all work, plaintiff testified that she has traveled since her alleged onset date. (Tr. 20). Specifically, the ALJ noted that plaintiff testified that she went on a five-day cruise to Cozumel, Mexico, in the summer of 2010, with her mother and children. (Tr. 20, 44). The ALJ stated that, "[a]lthough traveling and a disability are not necessarily mutually exclusive, the claimant's decision to go on a vacation tends to suggest that the alleged symptoms and limitations may have been overstated." (Tr. 20). The ALJ properly found that plaintiff's ability to take a vacation detracts from her credibility. See Renstrom v. Astrue, 680 F.3d 1057, 1067 (8th Cir. 2012) (claimant's multiple vacations was a factor detracting from his credibility).

Plaintiff argues that the ALJ's comments at the end of the hearing regarding plaintiff's cruise were disparaging, and call into question the ALJ's impartiality. Plaintiff objects to the following statement of the ALJ in response to plaintiff's request for a consultative mental evaluation: "I'm not going to order a consultative. I mean she just went on a cruise in July, this summer, I mean you know, talk about functional ability, you spend five days in the Caribbean." (Tr. 56). Plaintiff notes that she interjected that she "actually spent most of the time in [her] room while [her] kids went and played," yet the ALJ still denied her request for a mental examination. (Tr. 57). The ALJ stated in his decision that, although plaintiff testified that she cannot be around people, she was able to go on a five-day cruise to Mexico in the summer of 2010, "associating and interacting with several hundred other passengers in a rather confined ship setting." (Tr. 21-22).

The undersigned finds that the ALJ's statements during the hearing were not improper. Plaintiff testified that she experienced anxiety attacks, which were triggered by being around crowds of people, including crowds at the grocery store. (Tr. 39). The fact that plaintiff was able to go on a five-day cruise, during which she was in close contact with large crowds of people, detracted from the credibility of her allegations of an inability to be around people due to her mental impairments. The ALJ was merely responding to this conflicting testimony in his remarks made when denying plaintiff's request for a mental examination. The denial of plaintiff's request for a mental examination will discussed further with regard to the ALJ's RFC determination.

The ALJ proceeded to discuss other factors detracting from plaintiff's credibility. The ALJ stated that the objective medical evidence was not supportive of plaintiff's allegations of disability. (Tr. 21). Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility. See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003). The ALJ acknowledged that plaintiff experiences discomfort as a result of her physical impairments, but stated that the objective evidence does not support the presence of disabling pain. (Tr. 21). For example, the ALJ noted that there is no documentation of persistent significant limitations of range of motion, muscle spasm, muscular atrophy from lack of use, significant neurological deficits, or lack of alleviation of symptoms with medication. (Id.).

The ALJ pointed out that plaintiff's pain improved significantly with medication. (Tr. 21). Specifically, the ALJ noted that in March 2010, plaintiff reported to Dr. Coleman that her medications improved her pain eighty percent, and the injections improved her pain sixty percent.

(Tr. 31).  Evidence of effective medication resulting in relief may diminish the credibility of a claimant's complaints.  See Rose v. Apfel, 181 F.3d 943, 944 (8th Cir. 1999).

The ALJ next stated that plaintiff worked at the substantial gainful activity level in 2008, after her alleged onset of disability date.  (Tr. 22).  The ALJ noted that, absent a showing of deterioration, working at the substantial gainful activity level after the onset of an impairment is persuasive evidence of an ability to work.  Id.  See Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005).

Finally, the ALJ pointed out that none of plaintiff's treating doctors have expressed the opinion that plaintiff was unable to work.  (Tr. 22).  The presence or absence of functional limitations is an appropriate Polaski factor, and "[t]he lack of physical restrictions militates against a finding of total disability."  Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999) (citing Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir. 1993)).

An administrative opinion must establish that the ALJ considered the appropriate factors. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001).  However, each and every Polaski factor need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints.  See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001).  In this case, the reasons given above by the ALJ for discrediting plaintiff's complaints of disabling pain are sufficient and his finding that plaintiff's complaints are not entirely credible is supported by substantial evidence.

Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed as to this point.

**3.    Residual Functional Capacity**

Plaintiff argues that the ALJ erred in determining plaintiff's RFC.  Specifically, plaintiff contends that the ALJ failed to cite a medical source in support of his determination, relied on the opinion of a non-physician, and provided vague limitations.

The ALJ made the following determination regarding plaintiff's RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work, occasionally lifting/carrying 20 pounds and frequently lifting/carrying 10 pounds, as defined in 20 CFR 404.1567(b) and 416.967(b), except that she requires a sit/stand option at will, and has the ability to walk 4 out of 8 hours for a full 8-hour workday.  The claimant has unlimited ability to perform gross and fine movements and to push/pull within the weight limitations, except for occasional pushing with the lower extremities.  She can occasionally climb stairs but no ladders, ropes, or scaffolds.  She cannot run.  She can occasionally bend, stoop, crouch, crawl, balance, twist, and squat.  The claimant should have limited exposure to heights, dangerous machinery, uneven surfaces, and vibration.  The claimant gets along with others, understands simple instructions, concentrates and performs simple tasks and responds and adapts to workplace changes and supervision but in a limited public/employee contact setting.

(Tr. 18).

A disability claimant's RFC is the most he or she can still do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1).  In McCoy v. Schweiker, 683 F.2d 1138 (8th Cir. 1982) (en banc), the Eighth Circuit defined RFC as the ability to do the requisite work-related acts "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Id. at 1147.  The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'"  Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

Although assessing a claimant's RFC is primarily the responsibility of the ALJ, a "'claimant's residual functional capacity is a medical question.'" Lauer v. Apfel, 245 F.3d 700,

704 (quoting <u>Singh v. Apfel</u>, 222 F.3d 448, 451 (8th Cir. 2000)).  The Eighth Circuit clarified in

<u>Lauer</u>, 245 F.3d at 704, that "'[s]ome medical evidence,' <u>Dykes v. Apfel</u>, 223 F.3d 865, 867 (8th

Cir. 2000) (per curiam), must support the determination of the claimant's RFC, and the ALJ

should obtain medical evidence that addresses the claimant's 'ability to function in the workplace,'

<u>Nevland v. Apfel</u>, 204 F.3d 853, 858 (8th Cir. 2000)."  Thus, an ALJ is "required to consider at

least some supporting evidence from a professional." <u>Id.</u> <u>See</u> <u>also</u> <u>Vossen v. Astrue</u>, 612 F.3d

1011, 1016 (8th Cir. 2010) ("The ALJ bears the primary responsibility for determining a

claimant's RFC and because RFC is a medical question, some medical evidence must support the

determination of the claimant's RFC."); <u>Eichelberger</u>, 390 F.3d at 591.

The ALJ noted that the Physical Residual Functional Capacity Assessment ("PRFCA")

was completed by a non-medical single decisionmaker, and, therefore, was not entitled to any

weight.  (Tr. 22, 314-19).  The ALJ stated that, although this opinion was not entitled to any

weight, "the Administrative Law Judge has reviewed that analysis, along with the record as a

whole, and finds it credible and persuasive.  The record in this case supports the limitations set

out therein."  (Tr. 22).

The single decisionmaker, Ioan Dacila, completed a PRFCA on March 20, 2010, in which

he expressed the opinion that plaintiff was able to occasionally lift twenty pounds; frequently lift

ten pounds; stand or walk six hours in an eight-hour workday; sit six hours in an eight-hour

workday; occasionally climb ladders, balance, stoop, kneel, crouch, and crawl; and should avoid

concentrated exposure to vibration.  (Tr. 314-19).

Under a test of modifications to the disability determination procedures, a single

decisionmaker "will make the disability determination after any appropriate consultation with a

medical or psychological consultant." 20 C.F.R. §§ 404.906, 416.1406 (defining role of single decisionmaker under proposed modifications to disability determination procedures). See also Shackleford v. Astrue, 2012 WL 918864, *3 n. 5 (E.D. Mo. Mar. 19, 2012) ("Single decision-makers are disability examiners authorized to adjudicate cases without mandatory concurrence by a physician.") (citation omitted). A single decisionmaker is not considered a medical source. See Gaston v. Astrue, 2012 WL 3045685, *2 (W.D. Mo. July 25, 2012). See also Kettering v. Astrue, 2012 WL 3871995, *21 (E.D. Mo. Aug. 13, 2012) (finding that ALJ did not err by failing to specify weight accorded opinion of "single decisionmaker" as "single decisionmaker" was a disability counselor and not an acceptable medical source as defined by the regulations). Indeed, it is error for an ALJ to consider a PRFCA by a single decisionmaker. See Andreatta v. Astrue, 2012 WL 1854749, *10 (W.D. Mo. May 21, 2012) (remanding case in which ALJ may have relied on PRFCA completed by single decisionmaker and referencing an agency policy that ALJs are not to evaluate in their opinions assessments by single decisionmakers). See also Dewey v. Astrue, 509 F.3d 447, 449-50 (8th Cir. 2007) (remanding case in which ALJ evaluated the opinion of a lay person as a medical expert).

In this case, although the ALJ acknowledged that the opinion of the single decisionmaker was not entitled to any weight, he proceeded to rely on this opinion, finding it "credible and persuasive." (Tr. 22). The ALJ erred in relying on the opinion of the single decisionmaker. See Andreatta, 2012 WL 1854749 * 10 (holding remand required when ALJ relied on the opinion of a single decisionmaker, even if the RFC would be permissible absent consideration of single decisionmaker's report).

Further, there is no opinion in the record from any physician regarding plaintiff's work-

related limitations. Plaintiff did not undergo a consultative physical examination. Objective testing revealed degenerative disc disease at the L5-S1 disc level associated with a moderate midline disc protrusion. (Tr. 226). Plaintiff's back impairment has been treated with narcotic pain medication and epidural steroid injections. In addition, the ALJ found that plaintiff's obesity was a severe impairment. There is no opinion from any physician, however, regarding how these impairments affect plaintiff's ability to work. Thus, the ALJ's physical RFC determination is not supported by substantial evidence.

Similarly, there is no medical opinion in the record regarding plaintiff's mental limitations. Plaintiff was diagnosed with depression and prescribed Cymbalta by her first treating physician, Dr. Cramp, in June of 2006. (Tr. 383). Plaintiff continued to complain of symptoms of depression and anxiety to treating physician Dr. Rothermich in 2008 through 2010. (Tr. 234-55). On February 20, 2008, Dr. Rothermich diagnosed plaintiff with suspected bipolar disorder/mood disorder and prescribed Symbyax. (Tr. 255). Dr. Rothermich continued to treat plaintiff's mental impairments with medication. Plaintiff complained of panic attacks in March 2009. (Tr. 252). Plaintiff complained of stress and anxiety in December 2009. (Tr. 236). Plaintiff complained of experiencing a panic attack while in traffic in June 2010. (Tr. 326). In July 2010, plaintiff reported that her panic attacks and anxiety were not helped with medication. (Tr. 325). On July 26, 2010, plaintiff complained of worsening panic attacks, with increased anxiety, racing thoughts, and inability to sleep. (Tr. 324). Dr. Rothermich diagnosed plaintiff with bipolar disorder exacerbation and insomnia, and prescribed Zyprexa. (Id.). Dr. Rothermich has provided no indication as to how plaintiff's mental impairments affect her ability to work.

The ALJ has the duty to develop the record, which includes developing the record as to

the medical opinion of the claimant's treating physician. <u>Higgens v. Apfel</u>, 136 F. Supp.2d 971, 978 (E.D. Mo. 2001) (citing <u>Brown v. Bowen</u>, 827 F.2d 311, 312 (8th Cir. 1987). The ALJ is required to re-contact medical sources and may order consultative evaluations only if the available evidence does not provide an adequate basis for determining the merits of the disability claim. <u>Sultan v. Barnhart</u>, 368 F.3d 857, 863 (8th Cir. 2004). While the ALJ has an independent duty to develop the record in a social security disability hearing, the ALJ is not required to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped. <u>Goff v. Barnhart</u>, 421 F.3d 785, 791 (8th Cir. 2005) (quoting <u>Stormo v. Barnhart</u>, 377 F.3d 801, 806 (8th Cir. 2004)).

Here, as previously discussed, plaintiff's attorney requested a consultative mental examination at the conclusion of the administrative hearing. (Tr. 55). The ALJ denied plaintiff's request, noting that plaintiff had gone on a five-day cruise the previous summer. (Tr. 56). Although plaintiff's ability to go on a cruise detracts from the credibility of her allegations of an inability to be around people, it is not dispositive of her mental limitations. The medical record reveals that plaintiff has received treatment for a mood disorder and panic attacks. Plaintiff testified that she experiences periods of depression, during which she contemplates suicide and that she has attempted suicide in the past. (Tr. 48). Plaintiff has been prescribed multiple psychotropic medications. Thus, the ALJ should have further developed the record by either contacting plaintiff's treating physician or ordering a consultative mental examination addressing plaintiff's ability to function in the workplace. In addition, the ALJ should have further developed the record regarding plaintiff's physical impairments.

In sum, the residual functional capacity determined by the ALJ is not supported by

substantial evidence. The ALJ appeared to rely on the opinion of a non-medical single decisionmaker. No physician expressed an opinion regarding plaintiff's physical or mental ability to function in the workplace. As a result, the undersigned recommends that the decision of the Commissioner be reversed and this matter be remanded to the ALJ in order for the ALJ to obtain medical evidence addressing plaintiff's ability to function in the workplace, and reassess plaintiff's residual functional capacity.

## <u>RECOMMENDATION</u>

**IT IS HEREBY RECOMMENDED** that, pursuant to sentence four of 42 U.S.C. § 405 (g), the decision of the Commissioner be **reversed** and this case be **remanded** to the Commissioner for further proceedings consistent with this Report and Recommendation.

The parties are advised that they have fourteen (14) days in which to file written

objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an

extension of time for good cause is obtained, and that failure to file timely objections may result in

a waiver of the right to appeal questions of fact.


Dated this 22nd day of January, 2013.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE